**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and PINSON, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 8, 2022**

# In the Court of Appeals of Georgia

A21A1691. DUNWOODY OBSTETRICS AND GYNECOLOGY,
P. C., et al. v. FRANKLIN et al.

MERCIER, Judge.

Terri Franklin and Komarta Gorman, as the parents and next friends of Kendyl Gorman, (collectively the "plaintiffs") filed a medical malpractice action against Franklin's obstetrician, Alvin Sermons, M. D., and his medical practice, Dunwoody Obstetrics and Gynecology, P. C., (collectively the "defendants") claiming that Sermons acted negligently by failing to write an alternate prescription for Franklin's blood pressure medicine Benicar while she was pregnant with Kendyl or by failing to refer Franklin to another physician in order to find an alternative blood pressure medicine. The plaintiffs claimed that as a result of Sermons's negligence and Dunwoody Obstetrics's vicarious liability for that negligence, Kendyl suffered birth

defects due to fetal Benicar exposure. The jury found in favor of the plaintiffs, awarding them twelve million dollars. However, the jury also found Franklin 46% responsible, and the trial court subsequently reduced the award by 46% and entered a judgment for the plaintiffs of over six million dollars. The defendants appeal the judgment, alleging that the trial court erred by excluding evidence of Franklin's prior abortions and that the jury verdict was void because it was "fatally inconsistent."

We affirm. On the evidentiary issue, we conclude that excluding evidence of the plaintiff's abortions as a discovery sanction was not an abuse of the trial court's broad discretion to control discovery. The defendants did not disclose expert opinions relying on that evidence until one business day before the start of a complex medical malpractice jury trial, even though they had known about the factual predicate for those opinions for several years. The trial court viewed that last-minute disclosure as evidence that the defendants' interrogatory responses in the years of litigation leading up to the disclosure—none of which mentioned these now "critical" opinions—were "intentionally false and misleading." A finding like this—that a party has willfully failed to comply with discovery obligations—is committed to the trial court's broad discretion as long as "any evidence" supports it, and under clear Supreme Court precedent, a trial court may sanction such conduct by excluding the evidence at issue.

2

*Resurgens, P. C. v. Elliott*, 301 Ga. 589 (800 SE2d 580) (2017). As for the defendants' request to overturn the jury's verdict as "fatally inconsistent," we decline. The defendants contend that the jury's decision to assign 46% fault to Franklin "necessarily" means that the jury found that Franklin knew the risks of taking Benicar, which would have relieved them of liability. But, as we will explain below, there is at least one other permissible basis for that allocation of fault, and the law requires us to presume that the jury relied on the valid basis.

Following a jury's verdict and a trial court's subsequent entry of a judgment, this Court must affirm the judgment "if there is any evidence to support the verdict, because the jurors are the exclusive judges of the weight and credibility of the evidence. We must construe the evidence with every inference and presumption in favor of upholding the verdict." *Sagon v. Peachtree Cardiovascular and Thoracic Surgeons*, 297 Ga. App. 379, 379 (677 SE2d 351) (2009) (citation and punctuation omitted).

So viewed, the relevant evidence shows that Franklin began taking Benicar to treat her high blood pressure in February 2009. She learned that she was pregnant with Kendyl in August of 2010, and a friend of hers recommended Sermons as an obstetrician. Franklin testified that at her first appointment with Sermons, on

3

September 13, 2010, she told Sermons that she was taking Benicar and Sermons said, "well, that's not normally a medicine that you could take while being pregnant, but [I will] switch you later." Sermons did not tell Franklin that Benicar could harm her baby, nor did he instruct her to stop taking Benicar. Franklin subsequently refilled her Benicar prescription the same day.

At Franklin's following appointment with Sermons, they did not discuss Franklin's Benicar prescription. However, at her October 28, 2010 appointment, Gorman asked Sermons when Sermons was going to change Franklin's blood pressure medicine, and Sermons responded, "I'll switch it later."

Franklin and Sermons did not discuss Benicar at any of Franklin's ensuing doctor's appointments, until her March 3, 2011 appointment, when Franklin again mentioned that she was taking Benicar. Sermons did not tell Franklin to stop taking Benicar, and she was scheduled for another appointment with Sermons for March 17, 2011. However, after Franklin left Sermons's office on March 3, Sermons called her and told her to go to a maternal fetal specialist the next morning. The following morning at approximately 7:00 a.m., Sermons called Franklin again and told her to go straight to the hospital and that he would meet her there. When Franklin arrived at the hospital, she was admitted, and the treating physicians immediately took her off

4

of Benicar and prescribed her a different blood pressure medicine. Five days later, Kendyl was born premature, at 32 weeks, with brain damage, chronic kidney disease, and under-developed intestines. Franklin was diagnosed with oligohydramnios, where there is not enough amniotic fluid around the baby, which is associated with pre-term labor.

The plaintiffs filed this action in October 2012. At trial, the plaintiffs' expert testified that Sermons breached his duty of care by failing to tell Franklin to stop taking Benicar immediately. The defendants admitted that if Sermons had failed to tell Franklin to stop taking Benicar, it would have been a violation of the standard of care. Sermons testified, however, that he told Franklin at her first visit to stop taking Benicar, but she continued to do so. The jury resolved the dispute in the plaintiffs' favor. Following the trial court's entry of judgment, the defendants filed a motion for new trial, which the trial court denied.

1. The defendants claim that the trial court erred by excluding evidence of Franklin's prior abortions as a discovery sanction. "A trial court has broad discretion to control discovery, including the imposition of sanctions, and [this Court] will not reverse a trial court's decision on discovery matters absent a clear abuse of discretion." *Resurgens*, supra at 597 (2) (b) (citation and punctuation omitted). We

5

employ a clear abuse of discretion standard, "because, unlike the appellate courts, the trial court directly supervise[s] the ebb and flow of the discovery and trial process in the case and ha[s] the opportunity to observe and assess the conduct, demeanor, and credibility of the parties and their counsel throughout the proceedings." Id. at 598 (2)(b) (citation and punctuation omitted).

When Franklin first began seeing Sermons, she completed an intake form stating that she had three pregnancies, including one live birth and one miscarriage/abortion. However, in June 2013, the defendants took Franklin's deposition, which Sermons attended, during which Franklin testified that she previously had four abortions.

Almost *five years after* Franklin's deposition, the plaintiffs took the deposition of defendant's expert witness, Dr. Daniel Eller. Eller testified that he had reviewed Franklin's deposition and that the cause of Kendyl's brain injury was an infection and/or her prematurity, and that her other injuries (renal insufficiency and calvarial hypoplasia) and Franklin's oligohydramnios were due to Benicar exposure. Eller did not attribute any of Kendyl's injuries to Franklin's prior abortions, or her failure to inform Sermons of the abortions. Further, in the defendants' discovery responses, Sermons's deposition and the consolidated pretrial order, the defendants contended

6

that Sermons had warned Franklin of the dangers of taking Benicar and yet she continued to take the medicine despite Sermons's warnings. The defendants made no arguments, and gave no discovery responses or deposition testimony to suggest that Franklin's prior abortions, or her failure to disclose the abortions to Sermons, played a role in Kendyl's injuries. Moreover, in the consolidated pretrial order the defendants failed to even mention Franklin's prior abortions.

Two weeks prior to the start of trial, on October 7, 2019, the plaintiffs filed a motion in limine seeking to exclude all evidence of Franklin's abortions. On October 17, 2019, four days before the start of trial (and over six years after Franklin's deposition), the defendants served a one paragraph supplemental discovery response[1] to an interrogatory requesting the identification of any expert witnesses the defendants expect to call at trial and a summary of their opinion, stating that

> in additional[sic] to the opinions previously offered by Dr. Eller, he is also expected to testify that the number of voluntary terminations [Franklin] endured prior to the pregnancy at issue caused [Franklin] to be at an increased risk for preterm labor/delivery. Defendants further

[1] See generally OCGA § 9-11-26 (e) (2) (B) ("A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which . . . [h]e knows that the response, though correct when made, is no longer true and the circumstances are such that a failure to amend the response is, in substance, a knowing concealment.").

state that Dr. Eller bases his opinions on his training and experience, as well as his review of the complaint and accompanying affidavit, the pleadings, the medical records, and the depositions taken in this case. Defendants further state that Dr. Sermons is also expected to testify that [Franklin's] prior medical history, including voluntary terminations, increased her likelihood of going into preterm labor/delivery. Dr. Sermons is also expected to testify that had he known about [Franklin's] prior medical history concerning voluntary terminations, it is likely that he would have referred her to a perinatologist to be evaluated for cervical insufficiency.[2]

The trial court held a hearing on the plaintiffs' motion in limine where the plaintiffs argued, inter alia, that the trial court should not let the defendants play a

---

[2] The defendants argue that Sermons was not required to supplement his discovery responses because he is a party defendant. Setting aside the requirement that a party has a duty to supplement his or her discovery responses, see OCGA § 9-11-26 (e) (2) (B), a defendant physician may testify in his or her own defense and does not fall within the same disclosure requirements as an expert who learned about the facts of the case outside of the course of treatment. See *McNabb v. Landis*, 223 Ga. App. 894, 895 (2) (479 SE2d 194) (1996). However, Sermons admitted that he learned about the abortions through Franklin's deposition and not in the course of his treatment of her. Because his knowledge of Franklin's abortions was acquired (and therefore his opinion was developed) in anticipation of trial, he was subject to the expert disclosure requirements. See *Glover v. Atkinson-Sneed*, 348 Ga. App. 679, 687-688 (1) (a) (824 SE2d 588) (2019) (A treating physician in a medical malpractice action, who seeks to testify regarding facts learned through litigation, may not "provide expert opinion testimony on the standard of care and whether that standard was breached, unless the witness has been identified as an expert in accordance with OCGA § 9-11-26 (b) (4) (A) (i)").

8

"gotcha game" on the eve of trial. Counsel for the defense argued that evidence of Franklin's prior abortions was "critical to [the] defense" and urged the trial court to deny the motion. The trial court excluded the evidence of Franklin's prior abortions, finding that the defendants' "failure to disclose this new theory was late and deliberate, and in the absence of supplemental disclosure, defendant's response to the [i]nterrogatories was intentionally false and misleading."

The available sanctions to a party, under OCGA § 9-11-37 (d), hinge on whether the party has received an evasive or incomplete response, or a false or deliberately misleading response. See *Resurgens*, supra at 595 (2) (a). If a party "receives an evasive or incomplete answer to a discovery request, in order to obtain an answer upon which it can rely, or sanctions for failing to produce the same, the party must file a motion to compel, obtain an order from the court compelling an answer, and then seek sanctions if the responding party still refuses to comply." Id. (citation and punctuation omitted). If a party fails to do so and then proceeds to trial, and is surprised due to the failure to seek additional information, "a continuance of the trial to allow the party to obtain more information is the proper remedy." Id.

However, where a party provides a false or deliberately misleading discovery response, a trial court is not limited to a continuance for a discovery sanction. See

9

*Resurgens*, supra at 595 (2) (a). We allow more stringent sanctions for a deliberately misleading discovery response because "[w]hen a party receives a substantive answer to a discovery request, they are entitled to believe that answer[.]" Id. While some of the available discovery sanctions may appear harsh,

> [a] litigant will not be heard to contend that its own conduct has removed it beyond the reach of sanctions, when it has frustrated the orderly process prescribed in OCGA § 9-11-37 by false or erroneous responses to interrogatories. To condone such conduct would force parties to assume the falsity of every sworn interrogatory response and file endless motions preserving their right to relief. Such a rule would allow the unscrupulous to conceal documents from opposing parties by the simple expedient of denying their existence, without fear of penalty if the deception were by some chance discovered. It would discourage diligence in seeking out relevant documents even on the part of those not actively dishonest. Lack of diligence or negligence would not only be unpunished, it would be rewarded.

Id. at 596 (2) (a) (citation, footnote, and punctuation omitted). As such, where a party has provided false or intentionally misleading responses to written discovery, including deliberately suppressing opinions of expert witnesses, "the aggrieved party may seek sanctions for the same, as allowing such hidden evidence to be admitted at

10

trial simply because it has some probative value rewards and encourages deceptive behavior." Id at 597 (2) (a).

Sermons and Eller were asked multiple times throughout the protracted litigation about the causes of Kendyl's injuries and Franklin's culpability in the same. They gave responsive answers, attributing many of Kendyl's injuries to Benicar exposure, and Sermons suggested that Franklin was culpable due to her failure to stop taking Benicar when he allegedly told her to do so. Not once did Sermons or Eller suggest that Franklin acted negligently by failing to disclose her prior abortions to Sermons, or that Sermons would have followed a different treatment plan, or that Franklin's prior abortions could have led to Kendyl's premature birth. Then, *six years after* the defendants learned of Franklin's abortions and *on the eve of trial*, Sermons and Eller changed their opinions to say, for the first time, that the abortions were "critical" to the defense and altered their opinions of Sermons's standard of care and causation. Defense counsel's statement that the evidence was "critical" suggests that he was aware the discovery responses should have been supplemented with the "critical" theories when the defendants learned of the abortions. See *Anglin v. Smith*, 346 Ga. App. 456, 462 (3) (816 SE2d 426) (2018) (court looked to counsel's statements defending the failure to disclose to support finding that the failure was

11

deliberate). The trial court did not abuse its discretion by finding that the defendants submitted false or intentionally misleading discovery responses by failing to reveal their "critical" defense that Franklin's prior abortions, and her failure to disclose the information to Sermons, contributed to Kendyl's injuries. See *Resurgens*, supra at 598 (2) (b) ("A trial court's finding that a party has wilfully failed to comply with its discovery obligations will not be reversed if there is any evidence to support it.") (citation and punctuation omitted); see *Anglin*, supra at 462-463 (3).

Here, the trial court explained that it found that the defendants' "response to the [i]nterogatories was intentionally false and misleading," and due to the "late and deliberate" failure to disclose Eller's and Sermons's opinions about Franklin's abortions until the eve of trial, it excluded the evidence. On appeal, the defendants argue that the only available remedy was a continuance.[3] This is incorrect. Evidence

---

[3] The defendants claim that the Supreme Court of Georgia resolved a similar question in *Lee v. Smith*, 307 Ga. 815 (838 SE2d 870) (2020). However, *Lee* addressed whether a trial court could exclude an expert witness solely because the witness was identified after a scheduling order. See id at 821-822 (2). The Supreme Court in *Lee* reversed in part and remanded for the trial court to reconsider its ruling while examining the following factors: "(1) the explanation for the failure to disclose the witness, (2) the importance of the testimony, (3) the prejudice to the opposing party if the witness is allowed to testify, and (4) whether a less harsh remedy than the exclusion of the witness would be sufficient to ameliorate the prejudice and vindicate the trial court's authority." Id. at 824 (3) (footnote omitted). Unlike *Lee*, Sermons and Eller's testimony was not excluded solely because it was disclosed after a scheduling

supported the trial court's finding that the defendants' response was intentionally misleading, and given the seven years of litigation that preceded the trial, the trial court did not abuse its broad discretion by imposing Rule 37 (d) sanctions and excluding the evidence of Franklin's abortions. See *Resurgens*, supra at 599 (2) (b) (no abuse of discretion when trial court excluded material witness due to deliberate suppression.); *Anglin*, supra at 462-464 (3) (no abuse of discretion when party failed to supplement their discovery response and trial court excluded a previously undisclosed affidavit of witness); *Jones v. Livingston*, 203 Ga. App. 99, 102-103 (4) (416 SE2d 142) (1992) ("The trial court did not abuse its discretion by refusing to allow defendants' expert to testify concerning a subject matter not revealed to plaintiffs.").[4]

2. The defendants also claim that the jury's verdict was fatally inconsistent because the jurors found Franklin 46% liable. Specifically they contend that by

order. In the present matter, the trial court found that the defendants' discovery response was intentionally false and misleading due to the fact that the defendants gave a substantive response, which they failed to supplement with their "critical" defense until six years after Franklin's deposition and on the eve of trial.

[4] The defendants also enumerate as an error the trial court's alternative ruling excluding evidence of Franklin's prior abortions under OCGA § 24-4-403. However, given our ruling in Division I, we need not reach this claim of error.

13

assigning Franklin "46% of the responsibility necessarily means that the jury found that Ms. Franklin knew of the risks of taking Benicar but continued to do so[.]" (emphasis omitted). We find this argument unpersuasive.

"Verdicts shall have a reasonable intendment and shall receive a reasonable construction. They shall not be avoided unless from necessity." OCGA § 9-12-4. Of course, "if the verdict was contradictory, it was void and no valid judgment could be entered upon it; a judgment entered on such a verdict will be set aside." *Anthony v. Gator Cochran Constr.*, 288 Ga. 79, 80 (702 SE2d 139) (2010) (citation and punctuation omitted). But,

> the presumptions are in favor of the validity of verdicts, and if possible a construction will be given which will uphold them. Even if the verdict is ambiguous and susceptible of two constructions, one of which would uphold it and one of which would defeat it, that which would uphold it is to be applied.

Id. at 80-81 (citation and punctuation omitted).

We are, of course, not privy to the reasons the jury found Franklin 46% at fault. Perhaps the jury believed that Sermons breached his duty of care by failing to tell Franklin of the dangers of Benicar but that she should have conducted her own

14

research or listened to Gorman when he expressed reservations about Benicar.[5] As there were facts by which the jury could allocate Franklin 46% of the fault, "[w]e will not substitute our judgment based upon a cold record for that of enlightened jurors who heard the evidence and saw the witnesses." *American Petroleum Products v. Mom & Pop Stores*, 231 Ga. App. 1, 8 (4) (497 SE2d 616) (1998) (citation and punctuation omitted); see *Lucas v. Charles Schwab*, 354 Ga. App. 522, 525 (2) (841 SE2d 150) (2020) (jury verdict was not void when the verdict could reasonably be constructed in a way that upheld it). As a result, this enumerated error fails.

*Judgment affirmed. Dillard, P. J., and Pinson, J., concur.*

---

[5] Gorman testified that he suspected that Benicar could be harmful when taken while pregnant, and that he said as much to Franklin, but that she told him that she believed Sermons and did not think Benicar was harmful. Franklin testified that she did not remember Gorman expressing his reservations to her.